UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEWAL S. AUJLA, | ) | |
| | ) | |
| Petitioner, | ) | 13 C 1691 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| RICK HARRINGTON, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Petitioner Kewal S. Aujla, an Illinois inmate serving a forty-year sentence for the first degree murder of his wife, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. The habeas petition is denied, and the court declines to issue a certificate of appealability.

**Background**

A federal habeas court presumes correct the factual findings made by the last state court to adjudicate the case on the merits, unless those findings are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) ("We give great deference to state court factual findings. After AEDPA, we are required to presume a state court's account of the facts correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks omitted); *Rever v. Acevedo,* 590 F.3d 533, 537 (7th Cir. 2010); *Ward v. Sternes,* 334 F.3d 696, 704 (7th Cir. 2003). The Appellate Court of Illinois is the last state court to have adjudicated Aujla's criminal case on the merits. *People v. Aujla*, No. 2-06-1125 (Ill. App. May 4, 2009) (Doc. 10-1 at 1-35); *People v. Aujla*, 2012 IL App (2d) 100605-U, 2012 WL 6965071 (Ill. App.

Jan. 25, 2012) (Doc. 10-2 at 15-20). Aujla has not attempted to show, let alone succeeded in showing, the appellate court's factual findings to be incorrect.

### A. Factual Background

In 1999, Aujla married Narinderpal Aujla ("Rani"). Doc. 10-1 at 6. In April 2003, Aujla and Rani lived in a townhouse purchased by Rani's parents, while their daughter lived with Aujla's parents in India. *Ibid*. Rani was being treated for anxiety, and her family usually spoke with her by phone several times per day. *Ibid*. Rani's brother, Jatinderpal Sangh, testified that Rani took medication to "calm her down" and could get "verbally out of control," but added that she had been weakened from polio as a child and denied seeing her get physical when agitated. *Ibid*. Sangh estimated that Rani was five feet tall and weighed 100 pounds. *Id*. at 7.

When no one could contact Rani on April 9, 2003, her family reported her missing. *Id*. at 6. A lengthy search and investigation ensued. *Id*. at 7-8. On May 19, 2003, Aujla drove himself to the Round Lake Beach police station and agreed to speak with Sergeant Ziulek after being given his *Miranda* rights. *Id*. at 8. Ziulek described Aujla as being five feet eleven inches tall and weighing 190 pounds. *Ibid*.

Following questioning by Ziulek and Sergeant Chiarello, Aujla admitted to killing Rani and directed the police to her body. *Ibid*. Aujla gave the officers this account of the circumstances surrounding Rani's death:

> Defendant told Ziulek that Rani woke at 3 a.m. on April 9, 2003, complaining that her teeth hurt and [that she] wished to go to the doctor. Rani called her mother several times until her mother took the phone off the hook around 6 a.m. Defendant spoke with Rani's mother, who told him to give Rani two Seroquel pills. Rani did not wish to take the medications, so defendant said he would stay home from work if she did so. Rani took the medication, and she and defendant lied down in their separate rooms. Rani

asked defendant to take her to a family member's home in Grayslake, but defendant declined, explaining that he had to go to work. Defendant told Rani that he could take her to her parents' house in Buffalo Grove. Rani did not want to go there, so they argued. Rani was angry because defendant would not stay home from work that day, so Rani began hitting him on his back. Defendant grabbed her wrists, [and] Rani kicked him, so he let go. Rani picked up his car keys and said she would drive herself. Rani went to the garage, opened it, and started the car. Defendant became angry because Rani did not have a driver's license. Defendant closed the garage door, and led Rani inside by the arm. Defendant said the car was expensive and that he would be liable if she struck someone or wrecked the car while driving.

Defendant told Ziulek that Rani yelled at defendant after they went inside the house. Defendant admitted striking her face twice with an open hand. Looking scared, Rani ran to the kitchen and grabbed a garbage bag. According to defendant, Rani continued to fight and grab at him but she told defendant to tie her wrists together with the bag so she could not leave. Defendant became angry and wrapped the bag around her neck and squeezed it very hard for a while. Rani's mouth was open and she stopped speaking and breathing, but defendant kept squeezing. Defendant pushed Rani back, and her head struck a table as she fell, Rani breathed a couple times, but when defendant checked her pulse and listened, he could not hear any more breath sounds. A little blood dripped from her nose or mouth, so defendant covered her head with two garbage bags. Defendant sat on the couch and cried.

Defendant told Ziulek that he wrapped Rani's body in large garbage bags. Rani's mother called, and defendant said she was sleeping. Defendant said that he was scared and did not want to go to jail. He put her into the trunk of his car, and went to work as usual. During a work break, defendant took Rani's body to a storm sewer in the parking lot and put her body inside. Worried that the body might wash away in a storm, defendant secured it with rope and wire. Defendant climbed from the sewer and returned to work.

When Ziulek asked what made him choke Rani, defendant explained he was angry at her family and felt trapped by an arranged marriage. He claimed Rani's family never told him she was "retarded." Defendant was also angry that she might wreck the car or collide with someone. Ziulek testified that Rani's family had told him that Rani had been violent with defendant within the past year.

*Id*. at 8-10. Nancy Jones, a forensic pathologist, performed Rani's autopsy and concluded that the cause of death was strangulation and that the condition of the body was consistent with Rani's disappearance on April 9, 2003. *Id*. at 11.

Rani's mother testified that Rani occasionally could act in a childlike manner and would not take "no" for an answer. *Id*. at 12. Aujla testified that Rani used to beat him, and that he got "so angry" and upset that he strangled her out of anger. *Ibid*. Aujla said that Rani at times would get very upset and throw things at or kick him. *Id*. at 13. Aujla also said Rani's family saw her act out many times, but that the police were never summoned during their fights. *Ibid*. Aujla further testified that he, Rani, and their daughter moved out of Rani's family's residence because Rani constantly fought with others, including her brother's child. *Ibid*.

Aujla's testimony regarding the events leading up to Rani's death was largely consistent with what he told the police on the day he was arrested:

> At 9 p.m. on April 8, 2003, Rani and defendant went to bed in their separate bedrooms. During the night, Rani woke defendant and said she wished to make a phone call. Rani called her mother, who hung up on her, and Rani got very upset. Rani called her mother several times, and defendant eventually reached her on the phone. Rani's mother told defendant to give Rani two Seroquel tablets to make her sleep. Defendant did not see Rani actually take the pills, but she went to sleep for a while.
>
> Later, Rani entered defendant's bedroom even more upset, saying that she wished to go to her uncle's home in Grayslake. Defendant said he needed to go to work. At some point, they moved downstairs to the living room, where Rani began hitting defendant very hard. Defendant held Rani's hands and forced her to sit on the couch. Rani rose and ran toward the car keys in the kitchen. Rani went into the garage, opened the door, and started the car. Rani had never driven before and had no license or insurance. Defendant got very nervous and afraid, ran to close the door, turned off the car, grabbed the keys, and puled Rani from the car. Rani tried to pull away and kick him. Defendant held her and made her sit on the sofa again. Rani screamed, hit defendant, and ran into the kitchen.

> Rani ran back to defendant and kicked him very hard. Defendant got upset, held her arms, and slapped her twice on the face. Rani was holding a garbage bag and said that defendant should tie her hands. While "very, very angry," defendant grabbed the bag and put it around Rani's neck. Claiming to not know what he was doing, defendant testified that he squeezed with both hands for five seconds. Rani's mouth was open. Defendant pushed her, and she fell on her behind and then her head hit the table. Defendant saw blood running from her nose and mouth.

*Id*. at 13-14.

### B. Procedural History

Aujla was convicted by a jury and sentenced to forty years imprisonment. Doc. 10-5 at 147, 193. On direct appeal, Aujla pressed four claims, only two of which are relevant for present purposes: (1) that the trial court erred in restricting *voir dire* by preventing defense counsel from asking prospective jurors whether they would automatically find a person guilty of first degree murder if they heard evidence that the person caused another's death; and (2) that the trial court erred in refusing to let defense counsel maintain during closing argument that "anger" was another way to express "passion" for purposes of the second degree murder statute, while allowing the prosecutor to argue that anger had "nothing to do with" second degree murder. Doc. 10-1 at 36-84. The Appellate Court of Illinois affirmed. *Id*. at 1-35. Aujla pressed those two claims in a petition for leave to appeal ("PLA") filed with the Supreme Court of Illinois. *Id*. at 113-132. The PLA was denied. *People v. Aujla*, 919 N.E.2d 355 (Ill. 2009).

Aujla then filed a post-conviction petition in the state trial court. Doc. 10-2 at 1-5. The petition raised a single claim, ineffective assistance of trial counsel for failing to investigate and present evidence that Rani was mentally unstable and had a history of violence. Specifically, Aujla argued that counsel should have presented testimony from his mother and sister, whom he

claimed would have testified "to the victim's mental instability and her having broke the arm of her maternal grandmother." *Id*. at 4. The state trial court dismissed the petition. Doc. 10-2 at 6-14. The appellate court affirmed, deeming the claim "frivolous and patently without merit." 2012 IL App (2d) 100605-U at ¶ 21, 2012 WL 6965071 at *5 (Doc. 10-2 at 18-19). Aujla pressed his ineffective assistance claim in a PLA, Doc. 10-2 at 21-35, which was denied. *People v. Aujla*, 968 N.E.2d 1067 (Ill. 2012).

## Discussion

The Warden agrees that Aujla properly exhausted his state court remedies, that the state appellate court rejected Aujla's claims on the merits, and that 28 U.S.C. § 2254(d) governs this court's consideration of the merits of those claims. Doc. 9 at 3-4. "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (one citation omitted). Aujla does not seek relief under § 2254(d)(2). With respect to § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court did] on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694 (2002); *see also Brown v. Finnan,* 598 F.3d 416, 421-22 (7th Cir. 2010). "For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 131 S. Ct. at 785 (internal quotation marks omitted). "A

state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 786 (internal quotation marks omitted). Put another way, to obtain relief under the "unreasonable application" prong of § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

I.  **Limitations on Defense Counsel's *Voir Dire* Questioning**

Aujla argues that the trial court violated his Sixth Amendment fair trial right by prohibiting his defense counsel from asking prospective jurors during *voir dire* whether they would automatically find a defendant guilty of first degree murder if they heard evidence that the defendant caused another person's death. Doc. 1 at 7. In applying the § 2254(d) standard to this claim, this court reviews "the decision of the last state court that substantively adjudicated each claim." *Gonzalez v. Mize*, 565 F.3d 373, 379 (7th Cir. 2009). The last state court to substantively adjudicate this claim was the state appellate court on direct review, which resolved the claim as follows:

> Next, defendant argues that the trial court committed reversible error in restricting defense counsel from asking certain questions during *voir dire*. At one point during jury selection, defense counsel asked a prospective juror whether "[a] person is automatically guilty of first-degree murder" if he causes another person's death. The trial court sustained the prosecutor's objection. The court allowed defense counsel to rephrase the question, and counsel asked whether the juror could keep an open mind and consider all of the evidence before rendering a verdict. Defense counsel later asked other jurors whether they would "automatically conclude that [defendant is] guilty of first-degree murder" if they heard evidence that defendant caused the death of another person. The court sustained the prosecutor's objection

again and warned defense counsel against asking "repetitious, redundant" questions. The court explained that counsel's line of questioning "touches on the ultimate conclusion that the jurors will make."

*Voir dire* serves the dual purpose of enabling the trial court to select jurors who are free from bias or prejudice and ensuring that attorneys have an informed and intelligent basis on which to exercise their peremptory challenges. *People v. Pineda*, 349 Ill. App. 3d 815, 818 (2004). The right to a jury trial guarantees a fair trial by a panel of impartial jurors. *Pineda*, 349 Ill. App. 3d at 818. It is well established that limitation of *voir dire* questioning may constitute reversible error where such limitation denies a party a fair opportunity to probe an important area of potential bias or prejudice among prospective jurors. *Pineda*, 349 Ill. App. 3d at 818. The primary responsibility of conducting the *voir dire* examination lies with the trial court, and the manner and scope of such examination rest within the discretion of the trial court. *Pineda*, 349 Ill. App. 3d at 818-19 (2004). The trial court possesses great latitude in deciding what questions to ask during *voir dire*. *Pineda*, 349 Ill. App. 3d at 819. The standard for evaluating a court's exercise of discretion during *voir dire* is whether the questions posed and procedures employed created a reasonable assurance that prejudice would be discovered if present. *Pineda*, 349 Ill. App. 3d at 819.

Generally, questions about specific defenses are excluded from *voir dire*, *i.e.*, questions about beliefs concerning mistaken identify, self-defense, or the defense of compulsion. *People v. Boston*, 383 Ill. App. 3d 352 (2008). "An exception exists for matters of intense controversy when 'simply asking jurors whether they could faithfully apply the law as instructed [is] not enough to reveal juror bias and prejudice toward that defense.'" *Boston*, 383 Ill. App. 3d at 354, quoting *Mapp*, 283 Ill. App. 3d at 987. Examples of matters found to be controversial include the insanity defense, the intoxication defense, abortion, and the subject of interracial relationships. *Boston*, 383 Ill. App. 3d at 354; *Mapp*, 283 Ill. App. 3d at 987. Defendant offers no theory about how proof of sudden and intense passion resulting from serious provocation sufficient to reduce first-degree murder to second-degree murder is a controversial defense that would warrant *voir dire* on the subject. In fact, serious provocation arguably is so common a defense that asking jurors whether they could faithfully apply the law as instructed is enough to reveal juror bias and prejudice toward that defense. The trial court had broad discretion in deciding these matters.

*Voir dire* questions "shall not directly or indirectly concern matters of law or instructions." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007. Also, *voir dire* "is not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular

> predisposition. *People v. Bowel*, 111 Ill. 2d 58, 64 (1986). Defense counsel's proposed questions indirectly addressed the elements of first- and second-degree murder, which are matters of law that *voir dire* questions should not concern. Also, defense counsel's proposed questions attempted to indoctrinate the jury in defendant's favor by predisposing them to the defense theory that defendant's actions were the result of serious provocation. Under the circumstances, the trial court did not abuse its discretion in barring defense counsel from questioning prospective jurors about the defense.

Doc. 10-1 at 29-31 (alterations in original).

Aujla's habeas attack on this ruling is without merit. As the Seventh Circuit has held, "[t]he conduct of *voir dire* is left to the trial court's sound discretion," and criminal defendants generally "do not have a right to have a particular question asked" during *voir dire*. *Gardner v. Barnett*, 199 F.3d 915, 920-21 (7th Cir. 1999) (en banc); *see also United States v. Mordi*, 277 F. App'x 613, 616 (7th Cir. 2008) (same). It is true that "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992) (alterations in original). Yet the Supreme Court has held that the demands of fairness require trial courts to ask about particular topics at *voir dire* only under certain limited circumstances. For example, trial courts must ask *voir dire* questions about racial bias in cases where race might be an issue, *see Ham v. South Carolina*, 409 U.S. 524 526-27 (1973), and about whether prospective jurors in a capital case would automatically vote for the death penalty following a conviction for capital murder, *see Morgan*, 504 U.S. at 733-34. The Supreme Court has not held that fairness requires that prospective jurors be asked questions directed at determining whether they could follow instructions regarding the difference between first degree and second degree murder. So, the only clearly established Supreme Court precedent that the state appellate court had to apply was

general: "To be constitutionally compelled … it is not enough that [a criminal defendant's proposed *voir dire*] questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. 415, 425-426 (1991).

The state appellate court applied that general principle in a reasonable manner. The court first acknowledged that the Sixth Amendment jury trial right "guarantees a fair trial by a panel of impartial jurors," and that "limitation of *voir dire* questioning may be reversible error where such limitation denies a party a fair opportunity to probe an important area of potential bias or prejudice among prospective jurors." Doc. 10-1 at 29. The court then correctly observed that the scope of *voir dire* is left to the trial court's discretion. *Id*. at 29-30. The appellate court noted that "[t]he standard for evaluating a court's exercise of direction during *voir dire* is whether the questions posed and procedures employed created a reasonable assurance that prejudice would be discovered if present." *Id*. at 30. And the appellate court concluded that because Aujla "offer[ed] no theory about how proof of sudden and intense passion resulting from serious provocation … is a controversial defense that would warrant *voir dire* on the subject," and because "serious provocation arguably is so common a defense that asking jurors whether they could faithfully apply the law as instructed is enough to reveal juror bias and prejudice toward that defense," *ibid*., the trial court did not abuse its discretion in limiting *voir dire* in this manner. The appellate court's application of the general principle articulated by Supreme Court precedent governing the limitations a trial court may impose on *voir dire* questions falls within the range of permissible results, and therefore does not warrant habeas relief. *See Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *Hill v. Wilson*, 519 F.3d 366, 368 (7th Cir. 2008). That is, "[b]ecause

[Supreme Court] cases give no clear answer to the question presented, let alone one in [Aujla's] favor, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal quotation marks omitted).

Aujla argues that *Morgan* and *Witherspoon v. Illinois*, 391 U.S. 510 (1968), establish that his counsel was entitled to ask the questions that the state trial court prohibited him from asking. Doc. 13 at 10-11. But neither case is on point, as both address *voir dire* in the extraordinary setting of a capital case. As noted above, *Morgan* held that a defendant in a capital case is entitled to question the venire to determine whether any prospective jurors would automatically vote for the death penalty upon finding the defendant guilty of a capital offense. 504 U.S. at 733-35. *Witherspoon* held that jurors could not be excluded for cause simply because they voiced general objections to the death penalty. 391 U.S. at 519-21. Neither case is inconsistent with the appellate court's ruling that the mitigation of first degree murder to second degree murder is insufficiently controversial to require specific *voir dire* questioning.

Aujla also argues that the appellate court's ruling was "contrary to" federal law because the court "relied solely upon state law cases thereby failing to apply the correct, controlling United States Supreme Court authority." Doc. 1 at 9. But § 2254(d)(1) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court's decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Terrell v. Pfister*, 443 F. App'x 188, 193 (7th Cir. 2011) (same); *Stock v. Rednour*, 621 F.3d 644, 648 (7th Cir. 2010) ("Our review is of the state court's decision, not the cases it cited (or failed to cite) along the way.").

Finally, Aujla contends that "[t]he state courts identified the correct *state law* legal standard but applied it in an 'unreasonable' manner." Doc. 1 at 9 (emphasis added). But the question on federal habeas review is not whether a state court applied state law reasonably, but whether that court applied *federal* law reasonably. *See* 28 U.S.C. § 2254(a), (d); *Stock*, 621 F.3d at 648-49. A state court's erroneous application of state law does not warrant habeas relief. *See Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (internal quotation marks omitted); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002).

## II. Limitations on Defense Counsel's Closing Argument

Aujla next contends that he was denied a fair trial because his "ability to argue for a second degree murder verdict was unfairly restricted when the judge refused to let trial defense counsel argue that 'anger' was another way to express 'passion,' while letting the prosecutor argue that anger had 'nothing to do with' second degree murder." Doc. 1 at 7. The state appellate court held that the trial court appropriately sustained the prosecutor's objection to defense counsel's argument, and appropriately permitted the prosecutor's argument, because defense counsel's argument misstated the controlling Illinois law. The appellate court's discussion of that issue reads as follows:

> Defendant next argues that defense counsel was unfairly restricted from advocating a verdict of second-degree murder on the ground that defendant's "anger" toward the victim was another way to express "passion." Defendant similarly contends that the prosecutor was unfairly allowed to argue that defendant committed first-degree murder because

"anger has nothing to do with" second-degree murder. According to defendant, these alleged errors compel a new trial.

"Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). The regulation of the substance and style of closing argument lies within the trial court's discretion; the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Byron*, 164 Ill. 2d 279, 295 (1995).

Consistent with section 9-2(a)(1) of the Illinois Criminal Code of 1961 (Code) (720 ILCS 5/9-2(a)(1) (West 2006)) and the Illinois Pattern Jury Instructions, Criminal, No. 7.03 (IPI Criminal 4th 7.03), the trial court instructed the jury that first-degree murder could be reduced to the lesser offense of second-degree murder "if, at the time of the killing, the defendant acts under a sudden and intense passion resulting from serious provocation by the deceased. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

Defendant argues that whether defendant's anger amounted to a "sudden and intense passion" was a question of fact for the jury to resolve and that the trial court's restriction on closing argument was an improper comment on the sufficiency of the evidence. We disagree. The question of fact for the jury was whether the *evidence* established by a preponderance of the evidence that defendant acted under sudden and intense passion resulting from serious provocation. Rather than arguing that defendant acted under sudden and intense passion, defense counsel argued that anger *is* sudden and intense passion. In arguing that "anger" is another word for describing "sudden and intense passion," defense counsel was attempting to circumvent the jury instructions and provide an alternate definition of second-degree murder. Counsel may not misstate the law during closing argument. See, *e.g.*, *People v. McCoy*, 378 Ill. App. 3d 954, 965 (2008) (in prosecution for resisting a police officer, prosecutor's misstatement of law defining "resisted" was reversible error).

We agree with the State that the trial court did not abuse its discretion in barring defense counsel from arguing that "anger" amounts to "sudden and intense passion" for the purpose of reducing first-degree murder to second-degree murder. Defense counsel should have argued that the evidence supported a finding of sudden and intense passion in this case rather than arguing that anger *is* sudden and intense passion. The trial court correctly focused the closing argument on the correct legal standard.

Doc. 10-1 at 31-32.

This ruling is not contrary to or an unreasonable application of clearly established law. In *Herring v. New York*, 422 U.S. 853 (1975), the Supreme Court held that while the Sixth Amendment requires trial courts to give criminal defense counsel the opportunity to make a closing argument, the trial court has "great latitude in controlling the duration and limiting the scope of closing summations" and has "broad discretion" to "limit counsel to a reasonable time," to "terminate argument when continuation would be repetitive or redundant," and to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id*. at 862. Citing *Herring*, the Seventh Circuit held that the trial court "d[oes] not abuse its discretion by requiring the defense counsel to argue consistently with the correct law." *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984); *see also United States v. Sanchez*, 604 F.3d 356, 358-60 (7th Cir. 2010) (same); *United States v. Doe*, 705 F.3d 1134, 1149 (9th Cir. 2013) ("The district court did not forbid Doe from making a closing argument or from presenting his public authority theory; it merely prevented him from arguing incorrect statements of law, something that is well within the court's discretion.").

The state trial court here did precisely what precedent holds that a trial court may do—preclude defense counsel from making an argument that is inconsistent with governing law. Aujla's counsel wanted to argue that "anger" qualified as "sudden and intense passion" for the purpose of mitigating first degree murder to second degree murder. The trial court held, and the appellate court agreed, that this was an incorrect interpretation of Illinois law. Aujla takes issue with that holding, but his disagreement concerns a question of Illinois law and thus may not predicate habeas relief. *See Swarthout*, 131 S. Ct. at 861; *Estelle*, 502 U.S. at 67-68. Although

Aujla frames the claim as a federal "fair trial" issue, he in fact is "impermissibly attempting to use a petition for a writ of habeas corpus to press his preferred interpretation of Illinois law." *Curtis*, 552 F.3d at 582; *see Thompson v. Battaglia*, 458 F.3d 614, 618 (7th Cir. 2006) (denying habeas relief where the petitioner challenged the state courts' understanding of the Illinois second degree murder statute).

It bears mention that the state appellate court's view of the second degree murder statute is fully consistent with Illinois precedent. Under Illinois law, first degree murder is mitigated to second degree murder if the defendant proves, by a preponderance of the evidence, that at the time of the killing he was acting "under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9-2(a)(1). "The only categories of serious provocation that have been recognized in Illinois are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse." *People v. Ingram*, 946 N.E.2d 1058, 1074 (Ill. App. 2011) (internal quotation marks omitted). Mere anger is not among those categories. *See People v. Jefferson*, 628 N.E.2d 925, 931-32 (Ill. App. 1993) ("Thus, despite the evidence that defendant was 'angry,' his actions fail to demonstrate any sudden and intense passion."); *People v. Falls*, 601 N.E.2d 1276, 1283 (Ill. App. 1992) (distinguishing between "growing anger or resentment" resulting from martial discord and "the sudden and intense passion required by the [second degree murder] statute"). Thus, even if a federal habeas court could review the state appellate court's application of Illinois law, habeas relief still would be denied.

## III. Ineffective Assistance of Counsel

Finally, Aujla contends that his trial counsel was ineffective for failing to investigate and present testimony from Aujla's mother and sister regarding Rani's history of physical aggression. As Aujla concedes, Doc. 1 at 18, the state appellate court correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the appropriate constitutional standard. 2012 IL App (2d) 100605-U at ¶ 19, 2012 WL 6965071 at *4 (Doc. 10-2 at 17-18). Moreover, there is no Supreme Court case that resolved an ineffective assistance claim premised on materially identical facts differently than did the state appellate court here. Accordingly, the appellate court's decision was not "contrary to" clearly established federal law within the meaning of § 2254(d)(1).

Nor was the appellate court's application of *Strickland* "unreasonable." Under § 2254(d)(1), the "bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one." *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). "[O]nly a clear error in applying *Strickland* would support a writ of habeas corpus … because *Strickland* calls for inquiry into degrees, thereby adding a layer of respect for a state court's application of the legal standard." *Ibid*. (internal citations, quotation marks, and alterations omitted). Put another way, a federal court must deny habeas relief if the "state court [took] the rule [of *Strickland*] seriously and produce[d] an answer within the range of defensible positions." *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted).

For Aujla to have prevailed in state court on his ineffective assistance claim, he had to show (1) that his attorney's performance was deficient and (2) that prejudice resulted therefrom. *See Strickland*, 466 U.S. at 687. Here, after identifying the *Strickland* standard, the state appellate court held that Aujla "failed to meet his burden of showing that counsel's alleged omission prejudiced defendant at trial." 2012 IL App (2d) 100605-U at ¶ 23, 2012 WL 6965071 at *5 (Doc. 10-2 at 18). The court first considered Aujla's unverified affidavit asserting that he told counsel prior to trial to contact his sister and mother because they had observed Rani act violently toward her grandmother. 2012 IL App (2d) 100605-U at ¶ 22, 2012 WL 6965071 at *5 (Doc. 10-2 at 18). The court then described the affidavits from Aujla's mother and sister, which indicated that Rani broke her grandmother's arm at an unspecified location and time. *Ibid*. Based on its review of the record, the appellate court determined that "[t]he trial court likely would have found that evidence of Rani's unrelated battery of her grandmother would have been irrelevant and inadmissible in this prosecution, where the case turned on whether defendant acted under a serious provocation arising from a physical assault by Rani." 2012 IL App (2d) 100605-U at ¶ 24, 2012 WL 6965071 at *5 (Doc. 10-2 at 19). Because the "failure to offer inadmissible evidence is not ineffective assistance," the appellate court's conclusion that Aujla's ineffective assistance claim had no merit was reasonable. *Kavanagh v. Berge*, 73 F.3d 733, 736 (7th Cir. 1996); *see also Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

The appellate court also held that, "even if the jury had heard evidence that Rani broke her grandmother's arm at some unspecified time in the past, a defense of serious provocation would not have been established because defendant's own account of the events undermines his

defense theory." 2012 IL App (2d) 100605-U at ¶ 24, 2012 WL 6965071 at *5 (Doc. 10-2 at 19). In particular, the appellate court pointed to evidence that "just before the strangling and even during the fatal act, Rani was not hitting, kicking, or making any physical contact with defendant. In fact, according to defendant himself, Rani brought the plastic bag to defendant and offered to allow him to tie her up so that she could not leave in the car." 2012 IL App (2d) 100605-U at ¶ 25, 2012 WL 6965071 at *5 (Doc. 10-2 at 19). Taking these facts into consideration, the appellate court concluded that even if Aujla had presented testimony from his mother and sister, "the testimony would not have supported defendant's contention that Rani's hitting and kicking him and attempts to leave the house amounted to serious provocation that was reasonable and adequate. There is not a reasonable probability that the jury would have found a serious provocation sufficient to reduce defendant's crime to second-degree murder." *Ibid*. This ruling is eminently reasonable. See *Thompson*, 458 F.3d at 618 (holding that trial counsel was not ineffective for failing to introduce evidence that "would have been insufficient to reduce the charges against Thompson to second-degree murder").

**Conclusion**

Because all of Aujla's claims are without merit, his petition for a writ of habeas corpus is denied. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a final order adverse to the applicant." The applicable standard is as follows:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011); *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003). The court's denial of Aujla's petition rests on settled precedents and principles. The application of those precedents and principles to Aujla's petition does not present difficult or close questions, and so the petition does not meet the standard for granting a COA.

November 27, 2013                                     _____
                                                                   United States District Judge